IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| GREG OBENDORF, | ) | |
| | ) | Case No. CV 06-475-S-MHW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION, as Receiver for | ) | |
| WASHINGTON MUTUAL BANK, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Currently pending before the Court are Plaintiff's Motion for Partial Summary Judgment on Plaintiff's Mutual Mistake Claim (Docket No. 62), filed May 30, 2008 and Defendant's Motion for Summary Judgment (Docket No. 63), filed May 30, 2008.  For the reasons expressed below, the Plaintiff's Motion for Partial Summary Judgment will be denied and Defendant's Motion for Summary Judgment will also be denied.

## I.
## BACKGROUND

This litigation revolves around the purchase in 2006 of the Paradise Valley Farm by Plaintiff, Greg Obendorf ("Obendorf") from Defendant Washington Mutual Bank ("Washington Mutual").  The Paradise Valley Farm is located in Humbolt County, Nevada, and was one of

three properties that Obendorf purchased as a package from Washington Mutual, the other two properties being located in Idaho and Oregon.  These other two properties are not involved in this lawsuit.  Obendorf contends that the purchase price for the Paradise Valley Farm should be reformed to reduce the amount he paid Washington Mutual for this property.  He contends the property was represented to him as being an irrigable farm, when in fact the water rights had been cancelled by the State of Nevada before he purchased the property.  Obendorf's causes of action are based on theories of mutual mistake of fact, breach of the implied covenant of good faith and fair dealing, and/or fraud.

The three properties were originally owned by Phillip and Marilyn Geertson, ("Geertson") who had large operating loans and mortgages on the three properties with Washington Mutual.  In 2001, Roger Johnson ("Johnson"), Vice President and Special Assets Officer at Washington Mutual, became responsible for overseeing the Geertsons' loans.

As of December 27, 2001, the Geertsons were substantially in default of their loan obligations to Washington Mutual.  Over the next several years there were various forbearance and work out agreements between Washington Mutual and the Geertsons which culminated in settlement agreement in January, 2004.  This agreement provided that the Geertsons would place in escrow Deeds in Lieu of Foreclosure, along with estoppel affidavits and bills of sale in lieu of foreclosure, to guarantee that Washington Mutual would be repaid in accordance with the agreement.  At that time, the Geertsons owed Washington Mutual more than 4 million dollars. The Geertsons failed to make full payment of the first installment due in April of 2004. Washington Mutual sought to record the deeds and litigation to prevent the recording was initiated in Nevada and a petition for bankruptcy was also filed.

**Memorandum Decision and Order - Page 2**

Washington Mutual actively managed the Geertson's loan file between 2001 and 2006, when the property was sold to Obendorf.   Obendorf contends that during this time frame Washington Mutual became very familiar with the property through on-site visits and appraisals it ordered.  The knowledge that Washington Mutual developed during this period of time as to the nature of the property, *i.e.* whether it was irrigated and had valid water rights, or lack thereof, is relevant to arguments the parties now present to the Court.  Also relevant is what Odendorf knew or did not know at the time he purchased the farm.  Therefore the Court will discuss the course of events in some detail.

After the Geertson file was transferred to Johnson, he visited the Paradise Valley Farm to inspect Washington Mutual's collateral.[1]  During his visit, Johnson observed acres of farmland, pumps and irrigation equipment.  Johnson did not recall whether he observed actual irrigation during that visit but believed part of the property to be irrigated.

In May 2002, Washington Mutual retained appraiser Ken Brush to conduct an independent evaluation of the value of its collateral.  This appraisal identified that Paradise Valley Farm consisted of 2,095.44 acres with 1,467.06 acres of water rights.  The appraisal also identified various irrigation equipment on the property and eight wells.  Mr. Brush estimated the fair market value of the property to be $1,450,000.

Mr. Brush conducted another appraisal for Washington Mutual in September 2004.  This appraisal contained similar references to water rights and irrigated land as the 2002 appraisal. Washington Mutual also had a technical review performed by Rhoda Van Engelen, an appraiser in Washington Mutual's commercial appraisal department.  The purpose of the technical review

---

[1]  Washington Mutual's collateral included the real property and appurtenant water rights.

**Memorandum Decision and Order - Page 3**

was to critique and confirm the value of the collateral set forth in the appraisal conducted by Mr. Brush. *Id.* The technical review likewise identified the property as a 2,095.44 acre farm with 1,467.06 acres of water rights. Both the 2004 appraisal and technical review estimated the fair market value of the property to be $1,050,000.

As mentioned earlier, on January 16, 2004, the Geertsons executed a Deed in Lieu of Foreclosure on all three of their properties to guarantee performance of the settlement agreement. However, when the first installment was not paid in full in April of 2004, it took over a year before the deeds were recorded due to state court and bankruptcy proceedings. The deed was recorded on June 17, 2005.

In between the execution of the Deed in Lieu and its recording, a letter from the Nevada Division of Water Resources dated March 11, 2005 informed the Geertsons that their water rights were in poor standing and subject to cancellation. Washington Mutual and Johnson never received a copy of this letter.

Once the deed was recorded in June 2005, Johnson began communicating with Obendorf through his agents, realtor Jack Prater ("Prater") and Wells Fargo banker Kyle Hexom ("Hexom"), about the purchase of the Geetsons' properties located in Oregon, Idaho, and Nevada.

Obendorf and Prater traveled to Nevada in late August 2005 to take a look at the Paradise Valley Farm. Obendorf observed that the property was being actively farmed, the ground was planted in alfalfa seed and a farmer was spraying crops. He also observed irrigation pumps, pump stations, and an irrigation system set up for gravity irrigation. The following month, Prater verified the water rights by calling the Nevada Division of Water Resources and confirming the

information contained in the appraisals.  After that time, neither Obendorf nor Prater made any further inquiries into the status of the Nevada property's water rights with the Nevada Division of Water Resources.

In September 2005, Mr. Brush conducted another appraisal and Ms. Engelen performed another technical review.  The findings were consistent with the 2004 appraisal and technical review, except that the value of the property was estimated to be $1,025,000.  The appraisals from 2002, 2004 and 2005 were provided to Prater and Hexom during negotiations.  Based on these appraisals and his own observations of the Nevada property, Johnson believed the property to be irrigated.

On October 14, 2005, a letter addressed to the Geertsons from the Nevada Division of Water Resources notified them that the water rights for the Paradise Valley Farm had been cancelled. Johnson testified that neither he nor Washington Mutual received a copy of the letter. He also testified that the only thing he heard regarding a problem with the water rights to the Paradise Valley Farm came from Boyce Cook, a purported neighbor of the Nevada property. Although Johnson could not remember the specifics of the conversation, he testified that Mr. Cook "indicated that there was some kind of problem with the water rights."

Washington Mutual decided that because it was neither in possession or control of the property at that time, there was little, if anything, it could or should do about this issue.  Johnson never discussed this information with anyone outside Washington Mutual, including Obendorf or his agents.  Johnson recalls this conversation with Cook taking place before the Purchase and Sale Agreement with Obendorf was signed.

Obendorf also testified that around December 2005 or January 2006, he heard "through

the grapevine" that there was a problem with the water rights to Paradise Valley Farm.

Obendorf testified that he believed Prater heard this information from a real estate agent in

Nevada.  He also testified that he asked Prater to check on the status of the water rights with

Johnson.   Johnson and Prater maintain that no such conversation ever took place.  Johnson also

testified that neither Prater nor Hexom ever asked him about Paradise Valley Farm's water

rights.

Wells Fargo, Obendorf's lender, never performed an investigation into the water rights

on the property. Wells Fargo valued the property, including water rights, for its own internal

purposes but did not verify the water rights since the property was not taken as collateral for the

loan.  Wells Fargo did visit the Idaho and Oregon properties and made a final check of the water

rights in Oregon because these properties were being used as collateral.

Washington Mutual wanted to sell all three properties, Oregon, Idaho, and Nevada,

together.  Obendorf was primarily interested in the Oregon property and only pursued the

Paradise Valley Farm because "it was part of the deal."  Obendorf was not planning to farm the

land, but rather resell it in order to pay down his debt.  Prater testified that he and Obendorf

valued the Oregon property at $7.5 million, significantly more than the asking price for all three

properties and they valued the Paradise Valley Farm at $1.56 million.

Washington Mutual initially asked $3 million for all three properties but once a deal fell

through in December 2005, they raised the price to $4.25 million.  In arriving at these prices, the

appraisals for the Paradise Valley Farm were one of the many factors Washington Mutual

considered.  For the purposes of valuation, Johnson assumed the Paradise Valley Farm was

irrigated because he had "no specific knowledge it wasn't."  Johnson testified that had he known

there were no water rights associated with the Paradise Valley Farm, he "would have concluded that the property was worth less, by some measures . . . or may also have concluded that there was sufficient demand for the property [and that the current asking price was appropriate]."

On March 8, 2006, Obendorf entered into a Purchase and Sale Agreement and Escrow Instructions ("Purchase Agreement") with Washington Mutual to buy the Oregon, Idaho and Nevada properties for $4.25 million.  Johnson and his manager, Gordon Kovacs, were the only two parties who determined the final purchase price for the properties.   In order to do so, they assumed the properties had water rights.  The Purchase Agreement provided that Obendorf was "buying property 'as is,' 'where is,' and 'with all faults.'" It also provided: "Neither Seller, nor any agent of Seller makes any representations or warranties with respect to the physical condition or any other aspect of the Property, including, without limitation, water rights . . ."

Obendorf closed on the properties on or about April 14, 2006.  Shortly after closing, he discovered the water permits for the Nevada property had been cancelled and the underlying certificated water rights were no longer valid.  Obendorf attempted to get the water rights reinstated but was ultimately unsuccessful.

Obendorf filed suit on October 27, 2006, bringing claims of mutual mistake, breach of implied covenant of good faith and fair dealing, fraudulent misrepresentation, and claim and delivery.[2]  Obendorf filed a motion for partial summary judgment on his claim of mutual mistake on May 30, 2008.  Washington Mutual filed a cross motion for summary judgment on all three of the remaining claims.

---

[2]  This last claim was voluntarily dismissed on February 20, 2008 (Docket No. 53).

## II.
## Standard of Review

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. Rule 56, which provides in pertinent part, that judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007).

A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.,* at 250. "When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.,* at 254. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In determining whether a material fact exists, facts and inferences must be viewed most

favorably to the non-moving party.  To deny the motion, the Court need only conclude that a

result other than that proposed by the moving party is possible under the facts and applicable

law.  *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591 (9th. Cir. 1981).

      The Ninth Circuit has emphasized that summary judgment may not be avoided merely

because there is some purported factual dispute, but only when there is a "genuine issue of

material fact."  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir. 1992).  The Ninth

Circuit has found that in order to resist a motion for summary judgment,

> the non-moving party:  (1) must make a showing sufficient to
> establish a genuine issue of fact with respect to any element for
> which it bears the burden of proof; (2) must show that there is an
> issue that may reasonably be resolved in favor of either party; and
> (3) must come forward with more persuasive evidence than would
> otherwise be necessary when the factual context makes the non-
> moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund,* 882 F.2d 371,

374 (9th Cir. 1989).

### III.
### Discussion

**A.**    **Mutual Mistake**

      Obendorf argues that both parties shared a misconception regarding the water rights for

the Paradise Valley Farm at the time of contracting.  On his behalf, he points out that he paid

irrigated land prices for non-irrigable land, received the appraisals and technical reviews that

identified and valued the property as irrigable land and visited the property and concluded that it

was irrigated.  Obendorf also states that his agent, Prater, confirmed the validity of water rights

with the Nevada Division of Water Resources and that Prater was also advised by Johnson that

**Memorandum Decision and Order - Page 9**

the land was irrigated.  From Washington Mutual's perspective, Obendorf submits that it had appraisals and technical reviews performed that identified that property as irrigable and it had a security interest in the property and "appurtenant water rights."  Additionally, Johnson observed irrigation on the property, was not aware the water rights were cancelled and arrived at the final purchase price by valuing the property as irrigated farmland.  Obendorf sets forth that because Washington Mutual never discovered the water rights had been cancelled prior to closing, it was operating under a mistaken belief.

As to the materiality of the mistake, Obendorf asserts he paid money for the property with the intention of selling it as irrigated farmland.  Although he was most interested in the Oregon property, he still placed a value of $1.5 million on the Paradise Valley Farm and he would have not paid simply whatever price Washington Mutual was asking for the property.  As further evidence of the value placed on the property, Obendorf submits that the quitclaim deed executed by Johnson on behalf of Washington Mutual conveying the Paradise Valley Farm to Obendorf contained a stated value of $1.5 million

In response, Washington Mutual contends that the analysis must focus on the parties' beliefs at closing and any prior beliefs the parties had regarding water rights were changed by the rumors both parties heard.  Additionally, Washington Mutual points to the following facts: Obendorf was not planning to farm the land but immediately resell it;  after September 2005, he did not investigate the status of the water rights prior to closing like he did with the Oregon and Idaho properties; he did not separately value the water rights; and he cannot point to evidence to demonstrate what portion of the total asking price, $4.25 million, was attributed to Paradise Valley Farm since the purchase price was for all three properties.  Lastly, Washington Mutual

argues, for many of the aforementioned reasons, that the water rights were not material to Obendorf's decision to purchase the Nevada property.

A mistake is "unintentional act or omission arising from ignorance, surprise, or misplaced confidence." *Thieme v. Worst*, 745 P.2d 1076, 1079 (Idaho 1987) (quoting *Bailey v. Ewing*, 671 P.2d 1099, 1102 (Idaho Ct. App. 1983) (internal quotation marks omitted). A mutual mistake occurs when both parties at the time of contracting share a misconception regarding a basic assumption or vital fact upon which the bargain is based. *Id*. The mistake must be material, meaning it must be so substantial and fundamental as to defeat the objects of the parties. *Leydet v. City of Mountain Home*, 812 P.2d 755, 758 (Idaho 1991). The party alleging the mistake has the burden of proving it by clear and convincing evidence. *Hughes v. Fisher, LLC*, 129 P.3d 1223, 1231 (Idaho 2006).

The Idaho Court of Appeals has also noted that the presence of a mutual mistake does not always afford relief. *Bailey v. Ewing*, 671 P.2d 1099, 1103 (Idaho Ct. App. 1983). Quoting from the Restatement, it noted that a party bears the risk of a mistake when "he is aware at the time the contract is made, that he has limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." *Id*. (quoting RESTATEMENT (SECOND) CONTRACT § 154 (1981)).

Regarding Washington Mutual's argument that the water rights were not material to the purchase, although Obendorf did not intend to farm the land himself, he did intend to resell it as farmland. Clearly, water rights would be material to the sale and purchase of farmland in Nevada. The Idaho Supreme Court has held that the availability of water is so basic to the lease or purchase of real property, and when water is not deliverable, rescission of the transaction is an

available remedy.  *Thieme v. Worst*, 745 P.2d 1076, 1080 (Idaho 1987).

Here, Obendorf, based on his own observations and information he had received from his agent and Washington Mutual, had a mistaken belief that property had water rights.  It also appears that Washington Mutual was mistaken as well.  According to Washington Mutual, it did not know the water rights had been cancelled.  However, there is  evidence that both Washington Mutual and Obendorf had been informed of potential "problems" with the water rights.  Because of this evidence, there is a question of fact as to whether both parties were mistaken and summary judgment will be denied on this claim.

**B.    Implied Covenant of Good Faith and Fair Dealing**

Washington Mutual moves for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  Washington Mutual argues that the evidence fails to establish any instance of conduct that can serve as a basis for an alleged violation, nullification and/or significant impairment of Obendorf's rights under the contract.  It is submitted that Obendorf has received the benefit of the bargain because he has already recovered $4,029,000 of the $4,250,000 he paid for the properties by selling off portions of the Oregon property and the Paradise Valley Farm.  Additionally, Washington Mutual contends it did not make any representations contrary to those contained in the Purchase Agreement which stated that property was being sold "as is."

Obendorf asserts that Washington Mutual fails to acknowledge its own value placed on Paradise Valley Farm based on the fact that Johnson testified he valued the Nevada property as irrigated farm land.  The purchase amount paid by Obendorf and the amount accepted by Washington Mutual was based, at least in part, on Obendorf receiving 1,467.06 acres of irrigable

land.  Because he did not receive irrigable land, Obendorf asserts he did not receive the benefits negotiated for in the agreement.

The covenant of good faith and fair dealing requires that the parties perform the obligations imposed by their agreement in good faith.  *Bakker v. Thunder Spring-Wareham, LLC*, 108 P.3d 332, 339 (Idaho 2005).  Any action that violates, nullifies or significantly impairs any benefit of the contract is a violation of the covenant.  *Id.*  The covenant cannot override an express provision in the contract and will not be implied if contrary to the terms of the contract.  *Independence Lead Mines Co. v. Hecla Mining Co.*, 137 P.3d 409, 413 (Idaho 2006).  The covenant is an "objective determination of whether the parties have acted in good faith in terms of enforcing the contractual provisions."  *Id.*

Obendorf argues that both sides entered into the contract for the sale of the Paradise Valley Farm with the understanding that the property was worth the value that each side had agreed to, $1,500,000, because a substantial portion of the acreage was capable of producing crops through irrigation and generating income in this fashion.  If the farm, as sold, could not produce crops and income, then this would nullify or significantly impair a benefit of the contract that Obendorf expected to receive.  In other words, he would have paid more money to Washington Mutual for the property, than would otherwise be warranted, if the property could not produce crops and income.

The Court will deny summary judgment on this claim.   As with the other claims, the evidence is in dispute whether Obendorf was on notice that there were problems with the water rights.  Whether the cancellation of water rights, and Washington Mutual's arguable knowledge of such, impaired a benefit of the bargain thereby possibly violating the covenant of good faith

and fair dealing is a question of fact.

## C.    Fraud

Washington Mutual also moves for summary judgment on the fraud claim arguing that the only representation it made regarding water rights were contained in the appraisals, which were accurate at the time they were made.  After that time, September 2005, Washington Mutual made no further representations and even expressly disclaimed any representations in the Purchase Agreement.

In response, Obendorf contends that there are issues of fact regarding misrepresentations made by Washington Mutual that should defeat summary judgment at this time.  First, Obendorf points out that at the time the 2005 appraisal was *provided* to Obendorf, on or around October 24, 2005, the water rights had been cancelled and accordingly, the representations made in the appraisal were not accurate.  Obendorf also asserts that Washington Mutual had affirmative obligation to disclose any information known to it, such as the phone call from Boyce Cook, which would have apprised Plaintiff of the fact that the property no longer had any valid water rights.

To make out a prima facie case for fraud, a plaintiff must prove: (1) a statement or representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury.  *Hines v. Hines*, 934 P.2d 20, 24 (Idaho 1997).  The relevant time period for the falsity of a statement of fact is when it is made.  *See Strate v. Cambridge Telephone Co., Inc.*, 795 P.2d 319, 323 (Idaho 1990) (agreeing with the trial court that the fraud issue was not framed adequately because

plaintiff failed to allege that the defendants' representations were knowingly false when made).

The Court finds there to be questions of fact as to whether Washington Mutual knew the appraisal was no longer accurate and the water rights had been cancelled and also a question of fact exists as to whether Obendorf was ignorant of the falsity.

## <u>ORDER</u>

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)      Plaintiff's Motion for Summary Judgment (Docket No. 62), filed May 30, 2008, be **DENIED**.

2)      Defendant's Motion for Summary Judgment (Docket No. 63), filed May 30, 2008, be **DENIED**.



DATED: October 16, 2009

Honorable Mikel H. Williams
United States Magistrate Judge

**Memorandum Decision and Order - Page 15**